438 S.E.2d 825

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**David LEADINGHAM, Defendant Below, Appellant.**

No. 21678.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Dec. 14, 1993.

Dissenting Opinion of Chief Justice Workman Dec. 15, 1993.

James A. McKowen, James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, for appellant.

Kristen L. Keller, Chief Deputy Pros. Atty. of Raleigh County, Beckley, for appellee.

McHUGH, Justice:

David Leadingham was found guilty by a jury in the Circuit Court of Raleigh County of intimidation of judicial officers and witnesses, obstruction of justice, conspiracy to obstruct justice, conspiracy to commit first degree murder, reckless driving and threatening phone calls. Mr. Leadingham is now before this Court upon the appeal of his convictions.

I.

While Mr. Leadingham and his wife were in the process of getting a divorce, he allegedly threatened to kill his wife, her attorney, her attorney's wife and children, and persons attending the attorney's church and parochial school. Based upon these threats, a three-count indictment was issued against Mr. Leadingham on October 4, 1990, in which he was charged with obstruction of justice and intimidation of judicial officers and witnesses.

While Mr. Leadingham was confined in the Raleigh County jail on those charges, he met Walter Farris, an inmate who was serving a sentence for driving under the influence.[1] Mr. Farris contends that Mr. Leadingham told him that he wanted his wife to be killed.[2] Mr. Leadingham allegedly gave Mr. Farris the telephone number of his sister, Patsy Rose, and directed him to call her when he was released from jail.

After his release on March 15, 1991, Mr. Farris telephoned Ms. Rose to inquire about Mr. Leadingham. During their telephone conversation, Ms. Rose informed Mr. Farris that Mr. Leadingham was in Weston State Hospital where he was undergoing a court-ordered psychiatric evaluation. Mr. Leadingham was being evaluated at Weston State Hospital to determine whether he was competent to stand trial on the charges of obstruction of justice and intimidation of judicial officers and witnesses, and whether he suffered from mental illness. Ms. Rose and Mr. Farris then made plans to visit Mr. Leadingham at Weston State Hospital.

On March 22, 1991, the morning he was to visit Mr. Leadingham, Mr. Farris telephoned West Virginia State Trooper Jan Cahill at 1:30 a.m. and told him of the incriminating statements Mr. Leadingham had made while they were incarcerated together in the Raleigh County jail. Trooper Cahill then telephoned the prosecuting attorney at 2:00 a.m. because he thought she "might be a little bit more familiar with [Mr. Leadingham.]"[3]

Before Mr. Farris' first visit with Mr. Leadingham on the morning of March 22, 1991, Trooper Cahill provided him with a "hand-held pocket recorder." Mr. Farris and his wife then accompanied Ms. Rose to Weston State Hospital to visit Mr. Leadingham as they had previously planned. However, Mr. Farris did not speak privately with Mr. Leadingham during that visit, and thus did not use the tape recording device given to him by Trooper Cahill.

Mr. Farris later contacted Mr. Leadingham to arrange a second visit to Weston State Hospital.[4] On the second visit, which

---

1. Mr. Farris was incarcerated from November 2, 1990, until March 15, 1991.

2. Mr. Farris testified that Mr. Leadingham approached him while he was incarcerated in the Raleigh County jail, and that he did not know Mr. Leadingham prior to that time. Mr. Farris testified that they became cellmates, and that Mr. Leadingham told him that his wife "was trying to take everything he had and that he wanted her done away with." Mr. Farris stated that Mr. Leadingham said "[h]e wanted her shot, and he wanted her shot three times in the chest and twice in the head[,]" with "[a] .22 pistol" that had a "silencer."

On cross-examination, Mr. Farris testified that, while they were in jail, Mr. Leadingham did not ask Mr. Farris to kill his wife.

3. We note that the prosecuting attorney apparently also met with Mr. Farris. Mrs. Elizabeth Farris testified that she and her husband met "a couple of times in her office[.]"

4. The following conversation between Mr. Farris and Mr. Leadingham was recorded by Mr. Farris:

WALTER FARRIS: Hey, I'm going to come up and visit you Friday.

took place on March 29, 1991, Trooper Cahill drove Mr. Farris and his wife to Weston State Hospital and provided Mr. Farris with a tape-recording device. When hospital security found the recording device after searching Mr. Farris, they advised him that he could not bring the device into the hospital. Mr. Farris then brought the tape recording device to Trooper Cahill, who was waiting for him outside in his vehicle, and returned to visit Mr. Leadingham.

Mr. Farris alleges that, during the visit, Mr. Leadingham told him that he wanted him to kill his wife's attorney.[5] Mr. Leadingham allegedly gave Mr. Farris a description of the attorney's office and its entry.[6]

On May 6, 1991, Mr. Leadingham's trial began on the charges of obstruction of justice and intimidation of witnesses stemming from his earlier threats to kill his wife, her attorney, her attorney's family, and members of the attorney's church and parochial school. When the prosecuting attorney read out the names of Mr. and Mrs. Farris, who were subpoenaed by the State, during *voir dire,* Ms. Rose, upon hearing their names, purportedly found Mr. and Mrs. Farris and told them to "get out of town."

By the end of the day on May 6, 1991, the jury had not yet been sworn in. That same day, Mr. and Mrs. Farris received and recorded two telephone calls from Ms. Rose urging them to leave town. The next morning, Mr. and Mrs. Farris gave the tape recordings of the telephone calls to Detective Robertson. The tapes were later played by the State in the judge's chambers with the defense present.

Mr. Leadingham's attorney moved for both a continuance of the trial[7] and to be removed as counsel. Both motions, to which the State objected, were granted by the circuit court.

Thereafter, Mr. Leadingham and Ms. Rose were arrested on the charge that they conspired to commit murder. On May 15, 1991, they were both indicted by a grand jury on the charges of conspiracy to commit murder, and of obstruction of justice at the May 6, 1991, trial.

Mr. Leadingham's principal defense to all of the charges against him was insanity. At the trial on all of those charges, Mr. Leadingham's counsel moved to suppress all statements alleged to have been made by Mr. Leadingham to Mr. Farris on or after March 22, 1991.[8] That motion was denied by the circuit court. Defense counsel also objected to the prosecution calling Mr. Leadingham's former treating psychiatrist, who treated him for a "mixed bipolar disorder," to testify on matters counsel believed to be beyond those

---

[MR. LEADINGHAM]: Do what?
WALTER FARRIS: I'm going to come up and visit you Friday.
[MR. LEADINGHAM]: Well, come on up, man.
WALTER FARRIS: Are you sure?
[MR. LEADINGHAM]: Sure, hell, yeah. If you do now, *have Pat to call and make arrangements like she did,* so you'll get more than one hour. We'll get a couple of hours together, see.
(emphasis added).
Interestingly, in that same tape-recorded conversation, Mr. Farris told Mr. Leadingham "Well, like I told you, man, you know, if you ever need anything done, I'm out of jail now." In the same telephone conversation, Mr. Farris again stated "Yeah, if you need anything done, you know, like I was talking to you the other night ... we'll take care of that."

**5.** Mr. Farris testified that he spoke with Mr. Leadingham alone during the visit, and that Mr. Leadingham told him that, instead of his wife, he wanted his wife's attorney shot "three times in the chest and twice in the head."

We point out, however, that at the time Mr. Farris went to visit Mr. Leadingham at Weston State Hospital, it does not appear that the alleged conspiracy to commit murder existed. It was not until Mr. Leadingham purportedly asked Mr. Farris to kill his wife's attorney that an overt act was taken by a member of the conspiracy to effect the object of that conspiracy. *State v. Johnson,* 179 W.Va. 619, 371 S.E.2d 340 (1988).

**6.** Mr. Farris testified that Mr. Leadingham told him where the attorney's office was and described "a catwalk where he came out of."

**7.** The State, in this appeal, represents that the motion for a continuance was based upon Mr. Leadingham's request to join the charges for which he was currently standing trial with the charges involved in the murder conspiracy.

**8.** We note that counsel on behalf of Mr. Leadingham sought to suppress all statements made by him to Mr. Farris on and after March 22, 1991. In this appeal, however, he seeks to have suppressed all statements made by him to Mr. Farris on and after March 29, 1991.

reached by the psychiatrist during treatment. That motion was also denied. Defense counsel also made three motions for a mistrial and a motion for a directed verdict, all of which were denied by the circuit court.

Mr. Leadingham was ultimately convicted by the jury of all of the charges against him. He now appeals his convictions.

## II.

The first issue we shall address in this appeal is whether the circuit court erred in admitting the statements made by Mr. Leadingham to Mr. Farris regarding the alleged murder conspiracy on and after March 29, 1991.[9] In support of their arguments, both parties rely on a line of decisions issued by the Supreme Court of the United States, beginning with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The primary focus of the *Massiah* line of decisions concerned a defendant's rights under the Sixth Amendment of the United States Constitution. The Sixth Amendment provides, in relevant part, that "[i]n all criminal proceedings, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *Massiah* also touched upon the rights of a defendant under the Fifth Amendment of the United States Constitution. The Fifth Amendment provides, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself, nor be deprived of life,

liberty, or property, without due process of law[.]"

### A. Massiah and its Progeny

In *Massiah,* the petitioner and his co-conspirator were indicted for violating federal narcotics laws. The petitioner, after retaining a lawyer and pleading not guilty, was released on bail along with his co-conspirator. The co-conspirator then, in cooperation with government agents, allowed a radio transmitter to be installed in his car so that conversations between the co-conspirator and the petitioner could be overheard by a government agent. The incriminating statements made by the petitioner to his co-conspirator in the car were used against him at trial.

The *Massiah* Court, after granting certiorari, held that incriminating statements deliberately elicited by government agents from the petitioner, after he had been indicted and in the absence of his attorney, denied the petitioner his right to counsel under the Sixth Amendment. The Court concluded that the petitioner's own incriminating statements under these circumstances could not be used by the prosecution against him at trial.[10]

In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), while the defendant was incarcerated in jail pending his trial for armed robbery, government agents contacted an informant who was incarcerated in the same cellblock as the defendant, and asked him to be alert of any statements made by the fellow prisoners. The

---

9. Mr. Leadingham contends that his fifth and sixth amendment rights to counsel were violated because the State deliberately elicited information from him through an undercover agent in the absence of counsel. Mr. Leadingham contends that Trooper Cahill had knowledge of the charges against him, and encouraged Mr. Farris, with the approval of the prosecutor, to elicit statements from him.

The State asserts that Mr. Farris was not a police informant when Mr. Leadingham initiated a conversation with him in jail, and that he did not gain Mr. Leadingham's confidence because of any police action or any "deals" for his cooperation. The State contends that Mr. Leadingham was the one who asked Mr. Farris to come see him at Weston State Hospital. Furthermore, the State maintains that Mr. Farris did not say anything to Mr. Leadingham which was designed

to deliberately elicit incriminating statements. Finally, the State asserts that the information obtained by Mr. Farris did not relate to the charges already pending against Mr. Leadingham, but instead involved a new investigation regarding the conspiracy to commit murder.

10. This Court, in a similar case, reached the same conclusion as the *Massiah* Court. *Farruggia v. Hedrick*, 174 W.Va. 58, 322 S.E.2d 42 (1984). We held in the syllabus of *Farruggia*:

The Sixth Amendment to the *Constitution of the United States* prohibits the use at trial of incriminating statements made by a defendant to an accomplice after indictment and without the assistance of counsel when the accomplice was cooperating with the police and was equipped secretly to transmit and record the conversation.

defendant was ultimately convicted on the basis of incriminating statements he had made during conversations with the informant while he was incarcerated.

The *Henry* Court, in its analysis, recognized that:

> An accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then 'arm's-length' adversaries.

> When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents....

> Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government....

> Finally, [the defendant's] incarceration at the time he was engaged in conversation by [the informant] is also a relevant factor.... [T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents.

447 U.S. at 273–74, 100 S.Ct. at 2188, 65 L.Ed.2d at 124. The Court held that by intentionally creating a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, the government violated his Sixth Amendment right to counsel. *Id.*

Next, in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the court was faced with the issue of whether the defendant's Sixth Amendment right to the assistance of counsel was violated when incriminating statements made by him to his co-defendant, a secret government informant, after indictment and at a meeting between the two to plan their defense for trial, were admitted at trial. The Court, in reaffirming that the "Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent[,]" reaffirmed that *Massiah* "states a sensible solution to a difficult problem." *Id.* at 176, 179, 106 S.Ct. at 487, 489, 88 L.Ed.2d at 496, 498. The court explained:

> The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 179–80, 106 S.Ct. at 489, 88 L.Ed.2d at 498–99 (footnotes omitted).[11]

In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the defendant was incarcerated after his arraignment on charges arising from a robbery and murder, with an inmate who had agreed to work with the police as an informant. The informant was directed by the police not to ask the defendant any questions, and to merely listen to what the defendant may say in his presence. The defendant voluntarily made incriminating statements to the informant, which were reported by the informant to the police.

The *Kuhlmann* court reversed the Court of Appeals' holding that the defendant's right to counsel was violated. The Supreme Court held the Court of Appeals' decision was clear error in light of the provisions of 28 U.S.C. § 2254(d), which requires that the state court's factual findings be accorded the presumption of correctness.[12] *Id.* at 459, 106 S.Ct. at 2630, 91 L.Ed.2d at 385. The court recognized that

> the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' ... a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, *the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.*

*Id.* at 459, 106 S.Ct. at 2630, 91 L.Ed.2d at 384–85. (emphasis added and citation omitted).

Finally, the Supreme Court has held that the sixth amendment decisions in *Massiah, Henry* and *Moulton* do not apply in cases where charges have not been filed against the defendant for the offense which is the subject of the interrogation, and the Sixth Amendment right to counsel has not attached. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In *Perkins,* police placed an undercover agent in a cell with the defendant who was incarcerated on charges other than the murder the agent was investigating. The court held that the undercover agent posing as a fellow inmate did not need to give *Miranda* warnings to the incarcerated defendant because the *Miranda* concerns of a " 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* at 296, 110 S.Ct. at 2397, 110 L.Ed.2d at 251.[13] The court further held that the *Massiah* line of decisions did not apply because the subject of the interrogation was related to a separate offense for which no charges had been filed.

■ We believe that certain factors identified in the *Massiah* line of decisions should be taken into consideration by circuit courts in determining whether to grant motions to suppress incriminating statements elicited by an undercover informant working for the police from a defendant whose Sixth Amendment right to counsel has already attached. Thus, in considering whether to grant a motion to suppress incriminating statements elicited from a defendant by an undercover agent working for police, the circuit court should consider whether: (1) the police, through the use of an undercover agent, have intentionally created a situation likely to in-

---

**11.** The Court noted that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16, 88 L.Ed.2d at 499 n. 16.

**12.** The trial court had found, after hearing the testimony of the informant and the detective, that the detective instructed the informant 'to ask no

questions of [defendant] about the crime but merely to listen as to what [defendant] might say in his presence.' *Id.* 477 U.S. at 440, 106 S.Ct. at 2620, 91 L.Ed.2d at 372.

**13.** The Court further stated that "[c]oercion is determined from the perspective of the suspect." *Id.* 496 U.S. at 296, 110 S.Ct. at 2397, 110 L.Ed.2d at 251.

duce the defendant to make incriminating statements without the assistance of counsel; (2) the incriminating statements relate to an offense for which the defendant has already been indicted or the right to counsel has otherwise attached; (3) the police or prosecuting attorney knowingly circumvented the defendant's right to counsel and deliberately elicited incriminating statements from the defendant; and (4) the defendant has shown that the police and the undercover agent have taken some action, beyond mere listening, that was induced to elicit incriminating statements from the defendant.

### B. *Due Process*

■ While the *Massiah* factors would otherwise be applicable to this case, they are not controlling in light of the peculiar facts before us. *Massiah* assumes that there are no questions concerning the mental condition of the defendant. Nor in *Massiah* were the police and the prosecuting attorney, in a surreptitious attempt to obtain incriminating evidence against the defendant, seeking to penetrate the clinical environment where the court-ordered psychiatric evaluation of the defendant was occurring.

What this Court finds so compelling is the fact that Mr. Leadingham, at the time he allegedly made the incriminating statements, was not incarcerated in jail nor was he released on bail awaiting trial. Instead, he was confined in a psychiatric hospital for a court-ordered psychiatric evaluation. This Court is greatly troubled by a police practice that would allow an undercover informant to obtain incriminating statements from a defendant who is in a psychiatric facility for a court-ordered psychiatric evaluation.[14]

While this Court is fully cognizant of the State's interest in prosecuting crimes and protecting the public, there is nothing in the record before us that would even suggest that sending Mr. Farris to a psychiatric institution to elicit incriminating statements from Mr. Leadingham was crucial to solving the crime or protecting the public.

Equally compelling is the fact that Trooper Cahill testified that at no time did he or anyone else try to ascertain what Mr. Leadingham's mental condition was at the time he was in Weston State Hospital for a court-ordered psychiatric evaluation. Moreover, when Trooper Cahill contacted Trooper Gary McGraw of the Criminal Investigative Service of the State Police in Beckley to inquire whether it would be a problem for Mr. Farris to wear a "wire" into Weston State Hospital, Trooper McGraw, after making inquiries, advised him that the hospital staff "didn't want to be part of it[.]"[15] Yet, despite the wishes of hospital staff, Trooper Cahill sent Mr. Farris to Weston State Hospital with a recording device. The recording device was removed from Mr. Farris by hospital staff once Mr. Farris went through the scanner.[16]

While Mr. Leadingham was in Weston State Hospital, the evaluators determined that he was suffering from a bipolar disorder. In a forensic evaluation dated March 30, 1991, B.M. Hirani, M.D. reported that Mr. Leadingham suffers from a "Bipolar Disorder"[17] which "occurs from mental illness[,]" and that he "would need continued and ongoing psychiatric care and supervision."[18] Moreover, in his court assessment, conducted on March 29, 1991,[19] Robert W. Solomon, Ed.D. found that Mr. Leadingham "is not

---

**14.** Trooper Cahill testified that, prior to that time, he had never sent an undercover informant into Weston State Hospital.

**15.** Trooper Cahill testified that the hospital personnel were "just paranoid."

**16.** Trooper Cahill testified that the hospital staff "all but did a strip search on [Mr. Farris]."

**17.** Dr. Hirani stated in his report that Mr. Leadingham has been prescribed the drug Lithium, and that "[h]e will be able to be maintained on the Lithium on a consistent basis with monitoring of his blood Lithium level."

**18.** Dr. Hirani found Mr. Leadingham to be competent to stand trial and reported that he was "aware of the nature and gravity as well as the consequences of the crimes for which he is charged."

**19.** We note that this court assessment was conducted on March 29, 1991, the day of Mr. Farris' second visit to Mr. Leadingham at Weston State Hospital when it is alleged that Mr. Leadingham asked Mr. Farris to kill his wife's attorney.

responsible for criminal conduct, because at the time of the alleged offense, he was suffering from a mental illness or disease which made it impossible for him to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." [20] Thus, Mr. Leadingham's mental condition was clearly in question at the time Mr. Farris visited him at Weston State Hospital.

This Court has previously recognized that the pre-trial psychiatric examination is a "critical stage" of an adversarial criminal process. *State v. Jackson,* 171 W.Va. 329, 335, 298 S.E.2d 866, 872 (1982).[21] We found in *Jackson* that

> [w]hen a court, on its own or the State's motion, orders a pre-trial psychiatric examination of a defendant, we can presume there is a question about defendant's competency or mental condition. To guarantee that state and federal constitutional rights are scrupulously honored in these circumstances, we find that no waiver of these rights will be effective without advice of counsel.

*Id.* at 336, 298 S.E.2d at 873. We articulated this finding in syllabus point 3 of *Jackson:* "A defendant cannot waive his state and federal constitutional privileges against self-incrimination and rights to assistance of counsel at court-appointed pre-trial psychiat-

ric examinations except upon advice of counsel."

■ Moreover, *W.Va.Const.* art. III, § 10 states that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." Inherent in article III, § 10 of the *West Virginia Constitution* is the concept of substantive due process. *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 179, 233 S.E.2d 318, 324 (1977). Similarly, the Supreme Court of the United States has interpreted "the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores,* —— U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993) (citations omitted and emphasis in original).[22] The Supreme Court has explained that "[s]o-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California,* 342 U.S. 165, 172 [72 S.Ct. 205, 209, 96 L.Ed. 183] (1952),[23] or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325–326 [58 S.Ct. 149, 151–152, 82 L.Ed. 288] (1937)." *United States v. Salerno,* 481 U.S.

**20.** Dr. Solomon also found Mr. Leadingham to be competent to stand trial "in spite of his fairly serious affective disorder."

**21.** We also recognized in *Jackson* that a psychiatrist who examines the defendant for the State is for all purposes an officer of the State and is similar to any police officer when questioning the defendant. 171 W.Va. at 333, 298 S.E.2d at 870. We therefore held that "a pre-trial psychiatric examination is a 'custodial interrogation' by a state agent." *Id.* at 334, 298 S.E.2d at 871. Our holding in this regard is consistent with Rule 12.2(c) of the *West Virginia Rules of Criminal Procedure,* which provides, in pertinent part:

> No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue re-

specting mental condition on which the defendant has introduced testimony.

**22.** The Supreme Court pointed out in *Reno* that " '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " —— U.S. at ——, 113 S.Ct. at 1447, 123 L.Ed.2d at 16 (citations omitted).

**23.** In *Rochin* the Supreme Court explained:

> Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' *Malinski v. New York, supra* [324 U.S. 401] at 416–417 [65 S.Ct. 781, at 789, 89 L.Ed. 1029].

342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183, 188.

739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697, 708 (1987) (footnote added). "Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression[.]' " *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249, 259 (1989) (citation omitted).[24] Thus, when the State's action in obtaining incriminating evidence against a defendant is overzealous or outrageous and infringes upon a defendant's constitutional rights under the Fourteenth Amendment of the United States Constitution and *W.Va. Const.* art. III, § 10, due process and fundamental fairness preclude the State from using such evidence against the defendant. *See generally State v. Hinkle*, 169 W.Va. 271 n. 3, 286 S.E.2d 699 n. 3 (1982).

■ It logically follows from *Jackson* and the state and federal due process clauses that while a defendant is hospitalized in a psychiatric facility for a court-ordered psychiatric examination, his or her constitutional rights should be scrupulously honored. By sending an undercover informant to the psychiatric facility to obtain incriminating statements from a defendant while he or she is hospitalized for a court-ordered psychiatric evaluation, without ascertaining his or her mental

condition, the police fail to scrupulously honor the defendant's constitutional rights. Due process and fundamental fairness preclude the admission of incriminating statements which are obtained from a defendant by an undercover informant who elicits such statements while the defendant is hospitalized in a psychiatric institution for a court-ordered psychiatric evaluation.

Thus, we hold that under the Fourteenth Amendment of the United States Constitution and article III, § 10 of the *West Virginia Constitution*, due process and fundamental fairness dictate that the police and the prosecuting attorney be precluded from using an undercover informant to penetrate the clinical environment of a psychiatric institution in order to elicit incriminating statements from a defendant who is undergoing a court-ordered psychiatric evaluation. Any incriminating statements elicited from a defendant under these circumstances, upon proper motion by the defendant, shall be suppressed in the trial on the criminal charges to which the incriminating statements relate.

We conclude that the incriminating statements obtained by Mr. Farris from Mr. Leadingham should have been suppressed.[25] Therefore, we shall remand this case to the circuit court for a new trial.[26]

---

**24.** The Third Circuit of the United States Court of Appeals relied upon the Due Process Clause in *United States v. Triggs*, 588 F.2d 373 (3d Cir. 1978), a case involving entrapment. In finding that "[f]undamental fairness does not permit [the court] to countenance" the "egregious conduct ... of the government agents," the court cited the concurring opinion of Justice Powell in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976):

'Due Process in essence means fundamental fairness, and the Court's cases are replete with examples of judgments as to when such fairness has been denied an accused in light of all the circumstances.... The fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances.... Nor do I despair of our ability in an appropriate case to identify appropriate standards for police practices without relying on the "chancellor's" "fastidious squeamishness or private sentimentalism." '
588 F.2d at 381 (citation omitted).

**25.** We note that where the incriminating statements elicited from the defendant by an undercover agent concern a new crime for which the defendant has not been indicted, such statements may be admissible in the trial of the new crime. *Mealer v. Jones*, 741 F.2d 1451 (2d Cir.1984), *cert. denied*, 471 U.S. 1006, 105 S.Ct. 1871, 85 L.Ed.2d 164 (1985); *United States v. Missler*, 414 F.2d 1293 (4th Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Lisenby*, 716 F.2d 1355 (11th Cir.1983), *cert. denied, Capo v. United States*, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983). We caution, however, that where those statements are unlawfully obtained, such as in the case now before us, they would not be admissible.

**26.** We do not address Mr. Leadingham's assertion that the circuit court erred in refusing to direct a verdict of not guilty on the charge of conspiracy to commit murder in that there was insufficient evidence because we are remanding this case for a new trial.

We further note that, while the defendant has requested that all statements he made on or after

## III.

■ Mr. Leadingham also contends that the circuit court erred in refusing to grant his motion for a mistrial, including a motion for a mistrial made during the State's rebuttal argument for impermissible argument and prosecutorial misconduct. Mr. Leadingham objects to the following statements by the prosecuting attorney in closing argument, and asserts that they were clearly prejudicial:

> The proof in this case leaves no doubt that this defendant has engaged in a course and conduct that destroys the system. No one's dead, but you can kill it. And you can kill it by a verdict of not guilty or you can save it. And you can tell Mrs. Leadingham and every other victim in this case they were right when we asked them to trust us and we would protect them; or you can let everyone know they were wrong to trust us and we can't protect them.

However, as pointed out by the State, the circuit court gave a curative instruction to the jury.[27] The circuit court instructed that:

> Ladies and gentlemen of the jury, let me just again remind you that argument of counsel is argument of counsel. They have a right to address you in final summation, but you heard the evidence. You are the sole judges of the evidence as I've instructed you. I've given you the law and the case will be deliberated and decided by you, each one, on those standards and those standards alone.

■ Thus, in light of the judge's curative instruction to the jury, we cannot say that the statements of the prosecuting attorney in closing argument clearly prejudiced Mr. Leadingham or resulted in manifest injustice. *See State v. Ocheltree,* 170 W.Va. 68, 289 S.E.2d 742 (1982). As we recognized in syl-

labus point 8 of *State v. Hays,* 185 W.Va. 664, 408 S.E.2d 614 (1991): " 'A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.' Syl. pt. 5, *State v. Ocheltree,* 170 W.Va. 68, 289 S.E.2d 742 (1982)."

■ We caution, however, on remand of this case for a new trial, that a prosecuting attorney is in a quasi-judicial role and "is required to avoid the role of a partisan, eager to convict," and must "set a tone of fairness and impartiality[.]" Syl. pt. 1, in pertinent part, *State v. Critzer,* 167 W.Va. 655, 280 S.E.2d 288 (1981).

## IV.

■ Mr. Leadingham's final assignments of error, which were only briefly discussed in his appeal brief, involve first, whether the circuit court erred in permitting the state to call his former treating psychiatrist to give an opinion beyond those reached by the psychiatrist during his treatment of Mr. Leadingham, and second, whether the circuit court erred in denying his motion for a directed verdict on the ground that he was not guilty by reason of insanity based upon the court-ordered evaluation by Weston State Hospital.

■ Mr. Leadingham contends that by calling his treating psychiatrist, Basil Roebuck, M.D., and allowing him to testify against Mr. Leadingham as an expert,[28] the trial court violated the physician-patient relationship. Yet, counsel on behalf of Mr. Leadingham advised the circuit court, *in camera,* that he had no objection to Dr. Roebuck testifying regarding the "facts and opinions and/or conclusions" reached by Dr. Roebuck while he was treating Mr. Leadingham, but that he objected to him being al-

---

March 29, 1991, be suppressed, our holding today is limited to those statements obtained from him while he was in Weston State Hospital for a court-ordered psychiatric evaluation.

27. When counsel on behalf of Mr. Leadingham objected to the State's closing argument and requested a mistrial, the circuit judge, in overruling the motion, stated that he would "admonish the jury."

28. The question of whether a witness qualifies as an expert rests in the sound discretion of the trial court, and the trial court's decision will not be reversed unless clearly wrong. *State v. Hose,* 187 W.Va. 429, 419 S.E.2d 690 (1992); *State v. Baker,* 180 W.Va. 233, 376 S.E.2d 127 (1988).

lowed to testify regarding Mr. Leadingham's competency and legal sanity. Mr. Leadingham's counsel believed Dr. Roebuck could testify regarding his treatment of Mr. Leadingham but not as to whether he believed Mr. Leadingham was sane. Counsel on behalf of Mr. Leadingham does not cite any authority to support his assertion that the circuit court committed reversible error in allowing Dr. Roebuck to testify regarding Mr. Leadingham's sanity.

We point out, however, that the admissibility of testimony by an expert witness under *W.Va.R.Evid.* 703 is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong. Syl. pt. 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700, *cert. denied*, —— U.S. ——, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991). Based upon the record before us, we do not believe that the trial court's decision to allow Dr. Roebuck to testify regarding his opinion as to whether Mr. Leadingham was sane was clearly wrong.

 With respect to the issue of whether the circuit court erred in refusing to direct a verdict of not guilty by reason of insanity, we recognize that the jury heard conflicting evidence as to Mr. Leadingham's sanity at the time he allegedly committed the crimes for which he was charged. Dr. Solomon, the psychologist who evaluated Mr. Leadingham at Weston State Hospital, found that, although he was competent to stand trial, he was not criminally responsible for his actions prior to his evaluation at Weston State Hospital. Dr. Roebuck, Mr. Leadingham's treating physician, testified on rebuttal that there was nothing in Dr. Solomon's diagnosis of bipolar disorder without psychosis that would indicate insanity. While the State has the burden of proving sanity beyond a reasonable doubt, that " 'does not mean that the sanity evidence must be entirely without contradictions.' " *State v. McWilliams*, 177 W.Va. 369, 379, 352 S.E.2d 120, 130 (1986) (citation omitted). We believe that the sanity issue was properly presented to the jury and there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Mr. Leadingham was sane.

## V.

For the reasons stated herein, we reverse and remand this case to the circuit court for a new trial.

Reversed and Remanded.

WORKMAN, Chief Justice, dissenting:

(Filed Dec. 15, 1993)

I respectfully dissent from the majority's opinion. This case creates out of whole cloth a new right for criminal defendants for which the United States Supreme Court has not found to exist, and for which there is no constitutional basis. In so doing, the majority makes the lawful investigation of crime more difficult.

The Appellant was indicted in October 1990 on three counts of obstruction of justice and witness intimidation based on his threats to kill his wife, Agnes Leadingham, his wife's attorney, John Hutchison, and Mr. Hutchison's wife and children, as well as other persons who attended St. Francis de Sales Catholic Church and parochial school. The Appellant was incarcerated on these charges in the Raleigh County Jail, and was represented by an attorney.

While the Appellant was in jail, he met Walter Farris, who was serving a DUI sentence. Mr. Farris had never met the Appellant, Mrs. Leadingham, or John Hutchison. Further, Mr. Farris was not a police informant, had no pending charges or "deals" with the police and never received any benefit from the state, financial or otherwise, for his later cooperation with the law enforcement authorities.

Mr. Farris testified at trial that while in jail, the Appellant complained that his wife "was trying to take everything he had and that he wanted her done away with," and "he wanted her shot three times in the chest and twice in the head" by a .22 "[w]ith a silencer." The Appellant told Mr. Farris about his wife's daily habits and promised that whoever "killed his wife for him" would "be well taken care of." After Farris got out of jail, he called the Appellant "to see if he still wanted to make a deal." The Appellant was

subsequently transferred to the Weston State Hospital, for a psychological evaluation arising out of the pending charges.

After his release from jail, Mr. Farris contacted West Virginia State Police Trooper Cahill. Mr. Farris testified that he contacted the state police and notified them of the Appellant's murder solicitation. Mr. Farris agreed to maintain contact with the Appellant in order to "prevent a murder," since "[a]s long as he [the Appellant] was talking to me, he wasn't trying to hire someone else."

Based on the information received from Mr. Farris, Officer Cahill contacted the assistant prosecutor, Kristin Keller. Ms. Keller authorized the trooper to initiate an investigation. It is significant to note that the trooper initiated this investigation of the Appellant regarding the *new* charge of conspiracy to commit murder, not the charges for which the Appellant was already under indictment. The trooper's testimony indicated that he did not seek permission to accept Mr. Farris' offer of cooperation in order to get information on the charges already pending because the officer "wasn't even sure what they [the pending charges] were...." Trooper Cahill testified that even though he was aware of the Appellant and the charges against him, he had not "had anything to do with David Leadingham" or any of those pending charges.

On Mr. Farris' first visit to the Appellant at Weston, they did not speak alone. Mr. Farris visited him again at Weston State Hospital on March 29, 1991. Trooper Cahill drove Mr. and Mrs. Farris to Weston. Mr. Farris attempted to take a tape-recorder into the hospital, but hospital security denied him access with the recorder. Mr. Farris returned the tape-recorder to the trooper in the car outside and then proceeded back into the hospital where he was able to converse with the Appellant about the conspiracy. Mr. Farris described the resulting conversation: "I just asked him how he was doing and what had been happening[ ] [a]nd he started talking about Agnes. And he said not to hit Agnes; that he wanted her lawyer hit. And if the lawyer was hit ... that Agnes would back off." The Appellant went on to direct Mr. Farris to use the same method of murder on the attorney that he had previously described for his wife.

## DUE PROCESS

The majority hinges its decision on a due process analysis which arises out of this Court's decision in *State v. Jackson,* 171 W.Va. 329, 298 S.E.2d 866 (1982). In *Jackson,* the defendant argued that incriminating statements he made to a court-appointed psychiatrist as a result of a court-ordered psychiatric examination should have been inadmissible at trial as violative of his Fifth Amendment right against self-incrimination. *Id.* at 332, 298 S.E.2d at 869. The defendant argued that the statements were the result of a custodial interrogation in which *Miranda* warnings were not given, and the defendant did not have his attorney present. *Id.*

In *Jackson,* we recognized that the court-ordered "psychiatric examination is a 'custodial interrogation' by a state agent," thereby implicating a defendant's Fifth Amendment rights. *Id.* at 334, 298 S.E.2d at 871. However, we indicated that *Miranda* warnings did not have to be read; rather we required the circuit court to conduct an in camera hearing to excise any portion of the psychiatrist's report containing incriminating statements. *Id.* Finally, we found that the defendant had "the right to assistance of counsel at a pre-trial psychiatric interview," but that our state constitution "does not require counsel's presence at the actual examination." *Id.* at 335, 298 S.E.2d at 866.

Factually, the present case is not at all analogous to *Jackson* in that we are not dealing with incriminating statements elicited by a psychiatrist ordered by a court to conduct a psychiatric examination. The statements made by the Appellant in this case are ones he voluntarily chose to make and thus had nothing to do with the court-ordered psychiatric evaluation which the Appellant was undergoing. All the evidence at trial indicated that Mr. Farris went to police in order to prevent a crime. He didn't make any deals with police in exchange for his testimony. He was not placed in the jail as an agent for the State, and his relationship with the defendant was one initiated by the

two of them. The State's only direct role in the whole sequence of events was to drive Farris to Weston State Hospital. Finally, Mr. Farris did nothing to elicit the incriminating statements other than to go visit the Appellant and listen receptively.

The evidence clearly indicates that, unlike the psychiatrist in *Jackson,* Mr. Farris was not an agent of the State. In *Thomas v. Cox,* 708 F.2d 132 (4th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), the United States Court of Appeals for the Fourth Circuit addressed the concept of state agency with regards to informants. In *Thomas,* the informant went to the police with incriminating statements he obtained from the defendant, who was the informant's cellmate. *Id.* at 133. A state police officer asked the informant to go back to his jail cell and listen for anything else the defendant might say, but the informant was instructed not to ask the defendant any questions. *Id.* Also, the officer told the informant that he could not promise him anything in return for his help. *Id.* Indeed, like Mr. Farris in the instant case, the informant there also received no benefit whatsoever from the State. The informant, who testified that he was motivated by curiosity, obtained more incriminating statements from the defendant. *Id.* at 133–34.

The Fourth Circuit, in determining that the informant was not a state agent focused on the following facts: 1) the informant was " 'self-initiated' " and " 'motivated by conscience' " in making contact with the defendant and offering assistance to the state; and 2) the informant was

> at no time subject to the control of the Commonwealth, had made no prior 'arrangement' with the Commonwealth to procure information from or testify against the accused, and had 'nothing to gain' from his actions vis-a-vis the accused, having been promised no reward, nor having any reason created by the Commonwealth to anticipate any.

*Id.* at 135 (quoting in part from state trial judge's opinion).

> The *Thomas* court then stated that
> where the citizen himself actively, though surreptitiously, elicits disclosures, the only

question is whether at the critical time he was also a creature—an agent—of the state. . . .

> The point at which agency—hence proper attribution—for this purpose arises out of a government-citizen relationship is not subject to any bright-line test. . . .

*Id.* at 136 (footnote omitted). The Fourth Circuit held that

> We decline to find in the inmate-police encounter here the requisite degree of 'prearrangement' or 'ongoing cooperation' between state and witness required to implicate the state and thereby to invoke sixth amendment protections. To do so would be in practical effect to establish the principle that any voluntary proffer of inmate informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures arguably induced by circumstances of confinement that are subsequently made by an accused in conversations with the inmate. We do not believe . . . that the sixth amendment's protection of the right to effective assistance of counsel was intended to reach so far. . . .

*Id.* at 137 (citations omitted).

Hence, based on the Fourth Circuit's definition of state agency in *Thomas,* Mr. Farris was not an agent of the State and the *Jackson* case is clearly inapplicable to the facts of this case. There is nothing which would indicate that Mr. Farris had the requisite degree of prearranged or ongoing cooperation with the State to make him a State agent. The majority appears to have plucked the *Jackson* case up in an attempt to bolster their decision upon a rather shaky due process analysis, because it is otherwise unsupported by a straightforward Fifth or Sixth Amendment analysis.

In the due process analysis, the majority references many cases, but fails to apply these cases to the facts before us. Thus, the majority reaches the ultimate conclusion that what occurred in this case is fundamentally unfair without any real authority. The implications of the majority's decision are far-reaching. For instance, the majority states that it "is greatly troubled by a police prac-

tice that would allow an undercover informant to obtain incriminating statements from a defendant who is in a psychiatric facility for a court-ordered psychiatric evaluation." Op. at 832. However, what the majority neglects to point out is that *the Appellant invited* Mr. Farris to visit him, and Mr. Farris voluntarily went; hence, it was not a police practice or arrangement. The only involvement of the police was that they welcomed his voluntary cooperation and gave him a ride to Weston.

Further, the majority has effectively placed the burden on police officers to ascertain a defendant's mental condition before *new* serious crimes can be investigated. How can police officers possibly ascertain a suspect's mental condition? This is clearly the task of courts, when necessary, not police officers. Ironically, the majority itself concludes that "the sanity issue was properly presented to the jury and there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Mr. Leadingham was sane." Op. at 836. Clearly, it was not this Appellant's actual mental condition that impelled the majority to its decision, so much as the singular fact of being in a psychiatric hospital for evaluation. What is so magical about being in a hospital, as opposed to a jail, a public place, or one's own home if mental condition is the issue?

Finally, the majority states that a defendant's constitutional rights should be "scrupulously honored," "while a defendant is hospitalized in a psychiatric facility." Op. at 834. I strongly agree. As a matter of fact, such constitutional rights should be scrupulously honored at all other times as well. But there is no evidence which would indicate that the Appellant was deprived in any way of his constitutional rights in the instant case.

\* \* \* \* \* \*

The necessity for these convoluted mental gymnastics becomes clear when a straightforward Fifth and Sixth Amendment analysis is made.

## SIXTH AMENDMENT

The majority gives an extensive discussion of major Sixth Amendment cases and their reasoning, but neglects to apply them to the instant case. Perhaps that is because, when so applied, these cases do not support their position.

Let's take them one by one. In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the defendant and codefendant were indicted for federal narcotics laws violations. After retaining an attorney, the defendant was released on bail. The codefendant, who was also out on bail, decided to cooperate with federal agents and allowed an agent to install a radio transmitter to the codefendant's car. *Id.* at 202–03, 84 S.Ct. at 1200–01. Subsequently, unbeknownst to the defendant, a federal agent listened to incriminating statements made by the defendant to the codefendant while both were in the codefendant's car. *Id.* at 203, 84 S.Ct. at 1201. Those statements were introduced against the defendant at trial. The United States Supreme Court held that a defendant's Sixth Amendment right to counsel was violated when "federal agents had deliberately elicited" incriminating statements from the defendant after he was indicted and without the presence of his attorney. *Id.* at 206, 84 S.Ct. at 1203. In the present case, neither the trooper, nor Mr. Farris did anything to deliberately elicit incriminating statements from the Appellant. Further, it is important to remember that the incriminating statements were not obtained *after* the Appellant was indicted on the charges for which the incriminating statements were used.

Then, in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the defendant challenged the admissibility of incriminating statements he made to an inmate who was a paid confidential informant for the government. *Id.* at 266, 100 S.Ct. at 2185. The confidential informant, who was serving time in the same correctional facility as the defendant, was approached by the government and was advised by an F.B.I. agent to be alert to any statements made by the defendant, but not to initiate any conversations. *Id.* Subsequently, the defendant made incriminating statements to the paid

informant regarding the charges already pending against him. *Id.*

The Supreme Court in *Henry* held that the defendant's statements should not have been admitted against him at trial. *Id.* at 274, 100 S.Ct. at 2189. The Supreme Court focused on whether the government had deliberately elicited the incriminating statements from the defendant. *Id.* at 270, 100 S.Ct. at 2187. In reaching the conclusion that the statements were deliberately elicited, the Supreme Court stated:

> Three factors are important. First, Nichols [the paid informant] was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

*Id.* The Supreme Court, however, also stated that "[i]t is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity *prior to the time charges are filed.*" *Id.* at 272, 100 S.Ct. at 2187 (emphasis added).

None of these *Henry* factors were present in the instant case. Mr. Farris was not a regular government informant, and was not paid or remunerated in any way for the information he obtained from the defendant. In *Henry*, the incriminating information was obtained with regards to the charges already pending against the defendant. In our case, Mr. Farris was neither a regular informant for the State, nor was he paid for the incriminating statements he obtained. All he was trying to do was to help prevent a murder. Further, the incriminating statements obtained were not with regard to the pending charges against the Appellant.

In *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985), the Supreme Court held that "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *See* syllabus, *Farruggia v. Hedrick,* 174 W.Va. 58, 322 S.E.2d 42 (1984). However, the Supreme Court

went on to state that "*to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.*" *Id.* 474 U.S. at 180, 106 S.Ct. at 489 (emphasis added); *see Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 2398, 110 L.Ed.2d 243 (1990) (holding that there was no Sixth Amendment violation since "no charges had been filed on the subject of the interrogation, and our Sixth Amendment precedents are not applicable").

It is significant that in the present case, the trooper used Mr. Farris to pursue an investigation not involving the pending charges, but involving new charges to which the Appellant had subjected himself and for which the Appellant had not yet been indicted. Applying the analysis of the Supreme Court in *Moulton,* his Sixth Amendment right to an attorney had not yet attached concerning the conspiracy charges. *See* 474 U.S. at 180, 106 S.Ct. at 489. Moreover, other than driving Mr. Farris to Weston State Hospital, the trooper did nothing to aid him in obtaining the Appellant's incriminating statements. Mr. Farris' testimony indicated that he did not question the Appellant about the conspiracy, but merely asked the Appellant how he was doing. Finally, there is nothing in the record which indicates that Mr. Farris was a paid police informant or in any way received benefit from the State regarding his assistance.

In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a case similar to the present case, the police instructed an informant to listen to the accused in order to obtain the identities of the co-defendants. *Id.* at 439, 106 S.Ct. at 2619. The only comment the informant made to the defendant was that after hearing the defendant's story of what occurred concerning the crime committed, the informant remarked that the story " 'didn't sound too good.' " *Id.* at 439–40, 106 S.Ct. at 2619–20. The Supreme Court, in finding that the defendant's Sixth Amendment right to counsel had not been violated, instructed that

the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.... [A] defendant does not make out a violation of that right [to an attorney] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459, 106 S.Ct. at 2630 (citations omitted).

As in *Kuhlmann,* the Appellant in the present case does not make out a violation of the Sixth Amendment right by merely showing that Mr. Farris reported the Appellant's incriminating statements to the police. *See id.* The Appellant must show that Mr. Farris "took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* The Appellant failed to meet this burden.

Consequently, what should apply in the present case is the following law regarding a defendant's Sixth Amendment rights as summarized by the United States Court of Appeals for the Fourth Circuit in *United States v. Missler,* 414 F.2d 1293, 1303 (4th Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970):

The pendency of an indictment for one offense does not immunize a defendant from accountability for statements made after indictment in the commission of another crime, nor does it shield him from testimony concerning them. The cited cases forbid officers of the Government to elicit statements, out of the presence of counsel, from persons under indictment, and then to use those statements to convict them of the charges for which they were under indictment. They do not lay down a rule that persons under indictment may not be overheard and their statements repeated if the statements are of the nature of this appellant's—verbal acts constituting

an additional offense, not the one for which they were previously indicted.

*See Thomas,* 708 F.2d at 132.

Even under the application of the four factors which the majority directs the circuit court to consider in determining whether to grant a motion to suppress incriminating statements obtained by an informant for police, but which the majority failed to apply to the facts of the present case, the Appellant's statements would be admissible. Op. at 831. Trooper Cahill did not intentionally create a situation likely to induce the Appellant to make incriminating statements without his attorney present. The evidence demonstrated that Mr. Farris and the Appellant initiated their relationship and that the Appellant invited Mr. Farris to visit him. Additionally, the statements were not related to the charges for which the Appellant had already been indicted. Moreover, the police and prosecuting attorney did not knowingly circumvent the defendant's right to counsel because that right had not yet attached to the new charges. Finally, there was no showing that Mr. Farris took any action beyond visiting and listening which could constitute any attempt to deliberately elicit incriminating statements.

## FIFTH AMENDMENT

The Appellant's claim that obtaining the statement violated his Fifth Amendment right can be easily dismissed.[1] In *Perkins,* 496 U.S. at 292, 110 S.Ct. at 2394, a fellow inmate of defendant, Perkins, went to the police and told them that while he had been in prison with Perkins, Perkins told him about a murder which Perkins had committed. Based on this information, the police placed an undercover agent in a jail cellblock with Perkins, who was still incarcerated on charges unrelated to the murder in which the undercover agent was investigating. *Id.* at 294–95, 110 S.Ct. at 2395–96. When the undercover agent asked Perkins if he had killed anybody, Perkins made statements implicating himself in the murder. *Id.* The Supreme Court in holding that the statements were not obtained in violation of Perkins' Fifth Amendment right stated:

---

1. The majority does not even discuss the Fifth Amendment.

Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect.... When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking.... There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.

*Id.* at 296–97, 110 S.Ct. at 2397 (citations omitted).

Likewise, in *United States v. Stubbs*, 944 F.2d 828 (11th Cir.1991), the defendant Stubbs was arrested after she and her codefendant Edwards were searched by customs inspectors in the Miami airport. The search apparently uncovered cocaine planted on Edwards, while no contraband was found on the defendant. *Id.* at 830. Edwards confessed immediately to her involvement and offered to assist a DEA agent in getting the defendant to " 'speak the truth,' " in return for his help on Edwards' charges. *Id.* at 831. Subsequently, the defendant and Edwards shared a jail cell and it was during this time that Edwards obtained incriminating statements from the defendant. The *Stubbs* court held that "[i]f the Fifth Amendment is not implicated when the incarcerated person speaks freely to an undercover agent, we see no justification for concluding the result should be different where, as here, the cellmate is not actually an undercover law enforcement agent but instead is—at best—a confidential informant." *Id.* at 831–32 (footnote omitted). Moreover, the Eleventh Circuit concluded that "[f]or the same reasons that disposed of defendant's Fifth Amendment compelled self-incrimination claim, *Perkins* [496 U.S. at 292, 110 S.Ct. at 2394] defeats defendant's argument that the circumstances of her conversation with her friend and fellow prisoner reflected compulsion and amounted to 'interrogation' for purposes of her Fifth Amendment right to counsel claim." *Id.* at 832.

Thus, in the present case, the Appellant voluntarily placed Mr. Farris in his confidence and made incriminating statements to him. The evidence does not reflect that, based on the Appellant's perception, he was in a police-dominated atmosphere or he was coerced into making these incriminating statements. Simply stated, the Appellant freely and voluntarily elicited and discussed his plans to conspire to commit murder with Mr. Farris and the only active participation by the State in obtaining these incriminating statements was giving Mr. Farris a ride to the facility housing the Appellant. The majority somehow equates the provision of transportation for Mr. Farris to deliberate elicitation of incriminating statements from the Appellant. When one threatens to commit murder, voices those threats to a third-party who is not a government agent, who in turn gives testimony of the statements, how can it be said that the suspect's rights were in any way violated? There are certainly many instances where law enforcement authorities become overzealous in seeking evidence against suspects, and it is an important function for courts to intercede to protect the criminal suspect's rights. Here, the law enforcement authorities were remarkably restrained, and proceeded cautiously "by the book."

As the majority points out, due process prevents police from engaging in practices that " 'shock[ ] the conscience.' " Op. at 833 (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)). They fail to give any import to the fact that in the "pristine" environment of Weston's criminal unit, where murderers, rapists and sundry other violent individuals are housed, Mr. Leadingham was actively looking to hire a killer. The failure to have pursued this investigation in a lawful manner with the willing assistance of a citizen volunteer who by happenstance fell into a unique position to hear the Appellant conspire to commit murder would have been shocking to the conscience.

Based on the foregoing opinion, I respectfully dissent.