475 S.E.2d 307

**STATE of West Virginia, Appellee,**

v.

**Chester HOUSTON, Appellant.**

**No. 22950.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 16, 1996.

Decided July 3, 1996.

---

**219**

of one count of delivery of a controlled substance (marijuana). Upon that conviction, the defendant was sentenced to one to five years in the West Virginia Penitentiary, which was suspended, with probation being granted conditioned upon serving 120 days in the Upshur County Jail.

On appeal, the defendant assigns as error the trial court's refusal to direct a verdict of acquittal on the issue of entrapment; and the trial court's imposition of a sentence that was excessive under the circumstances. We do not find merit in either of the defendant's contentions and affirm the conviction.

## I.

### FACTS

On December 15, 1992, Deputy Richard Bennett (herein "Bennett"), a narcotics task force officer with the Upshur County Sheriff's Department, and Eddie Bennington (herein "Bennington"), a confidential informant who was working with Bennett, drove to the defendant's apartment complex for the purpose of purchasing marijuana from the defendant.[1] In order that the prospective transaction could be recorded, Bennington was equipped with a hidden body microphone which was being monitored and taped by Bennett from a vehicle strategically parked to capture the conversation between Bennington and the defendant.[2] Bennington found the defendant outside his apartment complex working on his automobile. When Bennington approached the defendant, the following colloquy occurred:[3]

> *Informant*—Ronny told me earlier I might be able to get a bag[4] off of you, man.

Darrell V. McGraw Jr., Attorney General, Scott E. Johnson, Assistant Attorney General, Charleston, for Appellee.

James E. Hawkins Jr., Rexroad and Rexroad, Buckhannon, for Appellant.

RECHT, Justice.

The defendant, Chester Houston, was convicted in the Circuit Court of Upshur County

1. In 1991, Eddie Bennington was indicted by a grand jury in Upshur County for cultivation and delivery of marijuana. Bennington ultimately pled guilty to cultivation of marijuana. As part of his plea agreement, Bennington agreed to work as an informant with the police. Deputy Bennett of the Upshur County Sheriff's Department testified that he was told by Bennington in December of 1992 "that he thought he could make a purchase" from the defendant. Presumably he meant the purchase of marijuana.

2. All of the tape recorded conversations were transcribed and made available to this Court in

lieu of listening to the actual tapes. There is no dispute as to the accuracy of the transcription, however, during the trial the jury only heard the audio version of the recorded conversations.

3. This colloquy is not the entire conversation between Bennington and the defendant, however it is the more prominent portion of that conversation as it relates to the issue of entrapment.

4. Testimony at trial revealed that the term "bag" as referred to by Bennington meant a small plastic sandwich bag of marijuana.

*Chez*—Who?

*Informant*—Ronnie B——.

*Chez*—I can't now.

*Informant*—Can't now, huh?

*Chez*—I just sold the last one a little while ago.

*Informant*—Just a little while ago? S[—]t. When will you get anymore? Do you know?

*Chez*—I don't know.

Later in the same conversation, there was some discussion which could be interpreted as inquiring whether the defendant could acquire more marijuana since he had "sold the last one a little while ago." The audio portion of this phase of the conversation between Bennington and the defendant was of poor quality, with the transcribed tape containing many inaudible statements. However, there could be little doubt that the essence of the conversation is that Bennington would be returning the next day in an attempt to purchase some marijuana from the defendant.[5] Following this meeting, Bennett instructed Bennington to return the next day to repeat his efforts to purchase marijuana from the defendant.

What occurred the next day is not entirely captured on tape since Bennington returned to the defendant's apartment without the hidden body microphone and without any funds to complete the transaction. However, according to Bennington's in-court testimony, he returned to the defendant's apartment the next morning (December 16, 1992) when what occurred is best described in Bennington's own words:

Q Okay and could you tell us what happened when you went back that next morning?

A He went somewhere, when I got there, he went somewhere else and he got some and he came back.

Q He got some what?

A Marijuana.

Q Okay and did you purchase the marijuana at that time?

A No, sir, I didn't.

Q Okay and why didn't you purchase it?

A Cause I didn't have the money and I did have the officer, you know.

Q Okay, and did you—so—did you indicate to him that you would come back later, or—

A Yeah, I told him I had to go get the money off either my brother or my mother.

Q Off of who?

A My brother or my mother.

Q Okay. So did you—you left at that time?

A Yes, sir, I did.

Q But he'd shown you the marijuana.

A Yes, sir.

Later that same day, Bennington and Bennett returned to the defendant's residence. Mr. Bennington was now wearing the hidden body microphone and was monitored and taped by Bennett. During this return visit, Bennington purchased 2.27 grams of marijuana from the defendant for thirty dollars. The entire transaction was recorded; however, significant portions of the discussion were inaudible.

5. This portion of the colloquy is as follows:
*Informant*—Will you be getting any in, or do you know?
*Chez*—Uh, (inaudible).
*Informant*—inaudible—but they didn't know if you still have it.
*Chez*—inaudible
*Informant*—Can you get any more?
*Chez*—(inaudible)
*Informant*—(inaudible)
*Chez*—(inaudible)
*Informant*—All right, I'll stop back in then.
*Chez*—All right.
*Informant*—Still working on them high building?

*Chez*—Yep
*Informant*—laugh—I don't like that job.
*Chez*—inaudible
*Informant*—I ain't doing that s[—]t no more. I'll stop in then tomorrow. What time would be a good time to catch you?
*Chez*—(inaudible) the car and then be right here.
*Informant*—I don't even remember exactly which one..
*Chez*—604
*Informant*—604. All right. I'll catch you later then Chez.
*Chez*—All right.

The defendant was indicted on May 10, 1993, for unlawfully and feloniously delivering a controlled substance in violation of W. Va.Code 60A–4–401(a) (1983).[6]

At trial, Bennington admitted on cross-examination that he persisted in his efforts to purchase marijuana from the defendant on several occasions prior and subsequent to December 15, 1992. On each of these occasions, the defendant would refuse to deal with Bennington. Mr. Bennington admitted that at the time of the delivery of marijuana, which formed the basis of the indictment, the defendant appeared hesitant, and Bennington acknowledged that he had "put a little pressure on" the defendant to sell him the marijuana.[7]

The defendant's version of the various transactions is that Bennington had approached him on December 13th and 14th trying to buy marijuana, to which the defendant replied on at least one occasion that "I don't mess with it, leave me alone." The defendant stated that when Bennington came to his house on December 15th, the defendant told Bennington that he would get him some marijuana from a third party so that Bennington would stop bothering him.[8] The defendant testified that Bennington tried to get him to sell drugs to Bennington several times after the sale transpired on December 16th (the date of the sale which formed the basis of the indictment), but he refused to sell Bennington marijuana because he knew it was wrong, and that except for the one transaction, the defendant never sold marijuana to Bennington.[9]

On June 28, 1993, the jury returned a guilty verdict of one count of delivery of a controlled substance, marijuana. The trial court, after conducting a sentencing hearing, entered an Order on January 27, 1994, sentencing the defendant to one to five years in the West Virginia State Penitentiary. That sentence was suspended and the defendant was placed on probation for a period of five

---

6. W. Va.Code 60A–4–401(a)(ii) (1983) provides, in pertinent part:

> (a) Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.
> . . .
> (ii) Any other controlled substance classified in Schedule I, II or III, is guilty of a felony, and, upon conviction, may be imprisoned in the penitentiary for not less than one year nor more than five years, or fined not more than fifteen thousand dollars, or both.
> Schedule I is contained within W. Va.Code 60A–2–204 (1991). Included in this rather extensive list of controlled substances is marijuana. W. Va.Code 60–2–204(d)(14) (1991).

7. At trial the following exchange took place between defense counsel, Mr. Hawkins, and Bennington:

> Mr. Hawkins: Did Chester appear hesitant to take part in this activity when this happened?
> Bennington: Yes, sir, he did.
> Q: You think you put a little pressure on him to do this?
> A: Yes, sir.
> Q: And you kept bugging him about it, right?
> A: Yeah.

8. At trial, the defendant testified on direct examination:

> Mr. Hawkins: Okay, what happened [on December 15]?
> Defendant: I got tired of him coming around and I told him I'd get it for him. To come back tomorrow.
> Q: Why did you agree to do this?
> A: I felt like I was pressured into all this. He just kept bugging me and kept bugging me and I wanted him out of my hair.
> Q: Do you normally do this type of thing. Chess?
> A: No, sir.

9. The defendant testified on direct examination:

> Mr. Hawkins: Did [Bennington] come to you and try to get you to [sell marijuana] again after the 16th [of December]?
> Defendant: Yes, sir.
> Q: When would that have been, if you recall?
> A: I don't recall what day that was on.
> Q: Okay and what happened on that occasion?
> A: He come and asked me to get him another one and I told him no.
> Q: Why wouldn't you do it?
> A: Because I knowed the first time when I went and done it, I knew it was wrong, and I felt bad about it.
> Q: Well, if you felt it was wrong and you felt bad about it, why did you do it?
> A: I got tired of him messing with me.
> Q: Did you think he'd go away.
> A: Yes, I thought he might go away.
> Q: Did he eventually quit coming around?
> A: Yes, sir.

years. One of the conditions of probation was that the defendant was to serve 120 days in the Upshur County Jail.

The issues raised by the defendant on this appeal are: (1) the failure of the trial court to enter a judgment of acquittal based on the defense of entrapment; and (2) the excessiveness of the sentence under the circumstances.

## II.

## DISCUSSION

### A.

*General Survey of the Entrapment Defense*

In reading the record, it appears that there may be some confusion as to the status of the defense of entrapment in West Virginia. This confusion is somewhat understandable given our formulation of this defense, which has developed as a two-tiered system utilizing what has been characterized as both the objective and subjective standards of the entrapment defense.

In order to understand how the entrapment defense has evolved to the point where this two-tiered standard is applied, we need to survey the entrapment defense so that we can analyze why we must now abandon this two-tiered approach in favor of a more theoretically sound doctrine.

The defense of entrapment grew from a need to provide the government with the means to effectively investigate so-called victimless crimes.[10] Law enforcement agents were thought to demand more aggressive and many times intrusive methods to combat crimes committed by willing participants, usually with no complaining victims, and not committed in public view.[11]

Many courts and legislators began to observe that these investigative measures could result in encouraging the commission of a crime by one who was not otherwise predisposed to commit the crime. Accordingly, the defense of entrapment emerged from the desire to address two competing legal and social values: on the one hand, the necessity to detect criminal activity such as the sale of narcotics, prostitution, gambling, and other consensual crimes, while on the other hand, prohibiting the government's encouragement or inducement of a citizen to commit a crime who is not otherwise disposed to that type of conduct.

■ It is critical to note that the theory central to the defense of entrapment is the defendant's predisposition to commit the crime. The United States Supreme Court has held that "the principal element in the defense of entrapment [is] the defendant's predisposition to commit the crime." *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 374 (1973). As we will discover, this principal element of predisposition became lost with the development of two rival standards of entrapment. These standards have become idiomatically known as the subjective test, which looks to the predisposition of the defendant, and the objective test, which looks to the conduct of the government.

The standard that has as its centerpiece the defendant's predisposition to commit the crime is the subjective or the "origin-of-intent" test. This subjective standard was shaped by a series of United States Supreme Court cases including *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).[12]

In *Sorrells*, the case that this Court considers the mid-wife of the subjective standard, a federal prohibition agent gained the confidence of the defendant by posing as a tourist and discussing common war experiences. The agent attempted on two occasions to purchase liquor from the defendant, but the

---

**10.** Victimless crimes generally fall under the category of the sale of narcotics, prostitution, gambling and other consensual crimes.

**11.** John D. Lombardo, Comment, *Causation and "Objective" Entrapment: Toward a Culpability-*

*Centered Approach,* 43 UCLA L.Rev. 209, 210 (1995).

**12.** The case credited as the first to recognize and apply an entrapment defense is *Woo Wai v. United States*, 223 F. 412 (9th Cir.1915).

defendant refused. On the third occasion, the defendant relented, resulting in his prosecution under the National Prohibition Act. Speaking for a majority of the Court, Chief Justice Hughes recognized and applied a theory whereby an entrapment defense prohibits law enforcement officers from instigating a criminal act by persons otherwise innocent in order to lure them into its commission and then to punish them. *Sorrells v. United States,* 287 U.S. at 448, 53 S.Ct. at 215, 77 L.Ed. at 420. There is no question that the thrust of the entrapment defense as announced in *Sorrells* concentrates on the predisposition of the defendant to commit a crime. "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Id.* at 451, 53 S.Ct. at 216, 77 L.Ed. at 422.

In *Sherman v. United States,* the Supreme Court renewed its commitment to an entrapment defense that pivots on the state of mind of the defendant. Chief Justice Warren, speaking for the majority, held that: "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States,* 356 U.S. at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851.

Finally, in *United States v. Russell,* the Supreme Court was invited to overrule both *Sorrells* and *Sherman* by a defendant contending that the entrapment defense should rest on constitutional grounds. The Court declined that invitation, recognizing that the defense of entrapment does not rise to constitutional proportion because the Government's conduct, in infiltrating a drug ring and supplying a necessary ingredient in the manufacturing of methamphetamine, violated no independent constitutional right. *United States v. Russell,* 411 U.S. at 430, 93 S.Ct. at 1642, 36 L.Ed.2d at 372–73.

■ The subjective test is generally mechanically applied as a burden-shifting defense with the defendant having the burden to prove government inducement. Once the defendant properly presents evidence of government inducement, the burden shifts to the government to prove the defendant was predisposed to commit the offense. *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).[13] *See also United States v. Jones,* 976 F.2d 176 (4th Cir.1992), *cert. denied,* 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); *United States v. Osborne,* 935 F.2d 32, 38 (4th Cir.1991); *United States v. Velasquez,* 802 F.2d 104 (4th Cir. 1986); *United States v. Hunt,* 749 F.2d 1078 (4th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614–15 (1985); *United States v. Perl,* 584 F.2d 1316, 1321 (4th Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979); *United States v. DeVore,* 423 F.2d 1069 (4th Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971). In most cases, the ultimate resolution of whether the government has satisfied its burden is for the jury. *See United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). *See also United States v. Johnson,* 872 F.2d 612, 621 (5th Cir.1989) ("Where there is some evidence to support a finding of predisposition, the issue [of entrapment] is properly presented to the jury."); *United States v. Nelson,* 847 F.2d 285, 287 (6th Cir.1988) ("[I]f there is any showing of predisposition, it is up to the jury to determine whether the government agents actually implanted the criminal design in the mind of the defendant.").

Instead of the courts and legislature permitting the subjective standard to guide the resolution of the entrapment defense, a curious thing occurred. Arising from a series of dissenting opinions, beginning with Justice Brandeis in *Casey v. United States,* 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632 (1928) (Bran-

---

**13.** In *Jacobson,* the United States Supreme Court stated:

> Where the Government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.

*Jacobson,* 503 U.S. at 548–49, 112 S.Ct. at 1540, 118 L.Ed.2d at 184.

deis, J. dissenting), Justice Roberts in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (Roberts, J., dissenting), and Justice Stewart in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (Stewart, J., dissenting), there developed another entrapment standard labeled as the objective or "police conduct" test. The objective standard makes the essential element of the defense turn on the type and degree of governmental conduct and not predisposition of the defendant to commit the charged offense. This objective approach is best articulated in Justice Stewart's dissenting opinion in *Russell* as:

> In my view, this objective approach to entrapment advanced by the Roberts opinion in *Sorrells* and the Frankfurter opinion in *Sherman* is the only one truly consistent with the underlying rationale of the defense. Indeed, the very basis of the entrapment defense itself demands adherence to an approach that focuses on the conduct of the governmental agents, rather than on whether the defendant was "predisposed" or "otherwise innocent." I find it impossible to believe that the purpose of the defense is to effectuate some unexpressed congressional intent to exclude from its criminal statutes persons who committed a prohibited act, but would not have done so except for the Government's inducements.

*Id.* at 441–42, 93 S.Ct. at 1647, 36 L.Ed.2d at 379 (Stewart, J., dissenting) (footnote omitted).

The problem with connecting the objective test to the entrapment defense is that because predisposition is the core of the entrapment defense, no degree of police misconduct, however egregious, would warrant dismissal where the defendant was predisposed to commit the crime. *See Russell*, 411 U.S. at 433, 93 S.Ct. at 1643, 36 L.Ed.2d at 374. Justice Rehnquist, however unwittingly, did formulate the foundation of converting this objective standard, that was destined to fail as an entrapment defense, to a viable but separate constitutionally based due process defense.

In *Russell*, Justice Rehnquist recognized that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." *Id.* at 431–32, 93 S.Ct. at 1643, 36 L.Ed.2d at 373.[14]

We see then that the integration of the objective test into the entrapment defense created the theoretical schism within entrapment jurisprudence. What is removed from the analysis in the objective standard is the predisposition of the defendant to commit the offense, which is the *causa sine qua non* of the entrapment defense.

This distinction has not been ignored in those jurisdictions that have rejected the objective test as part of the entrapment defense and have allocated its analysis to what may best be described as a claim of outrageous government conduct rooted in the constitutional guarantee of due process.

In *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978), the Court of Appeals of New York (the highest appellate court of that state) recognized the necessity of formulating a standard by which the conduct of law enforcement officers may be so reprehensible as to demand the dismissal of an indictment resulting from police misconduct, even though the defendant was predisposed to commit the offense for which he was charged.

---

**14.** The due process concerns raised in *Russell* survived subsequent reexamination in *Hampton v. United States*, as Justice Rehnquist recanted his dicta in *Russell*, stating that "[I]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113, 119 (1976). Thus, "[t]he remedy of the criminal defendant with respect to the acts of Government agents ... lies solely in the defense of entrapment." *Id.* at 490, 96 S.Ct. at 1650, 48 L.Ed.2d at 118. However, this recantation by Justice Rehnquist regarding an outrageous government conduct claim was rejected by Justices Blackman and Powell by way of a concurring opinion, and with the dissent of Justices Brennan, Stewart and Marshall, Justice Rehnquist's prediction of outrageous government conduct triggering due process principles, is still a legacy within federal jurisprudence.

In *Isaacson*, the defendant was charged with the delivery of cocaine following an elaborate ruse orchestrated by the New York State Police which included: (1) assaulting an informant; (2) withholding exculpatory information from an informant; and (3) instructing the informant how to lure a reluctant participant from State College, Pennsylvania to the state of New York exclusively for the purpose of making an arrest, which resulted in Isaacson's conviction and sentence to a term of fifteen years to life in Attica Prison. The New York court found the police conduct to be reprehensible, and what is unique about the holding in *Isaacson* is that the lower courts (trial and intermediate appellate courts) found that the defendant was predisposed to commit the offense for which he was charged. However, the court found that even though the defendant was predisposed to commit the offense, "the police conduct, when tested by due process standards, was so egregious and deprivative as to impose upon us an obligation to dismiss." *Isaacson*, 406 N.Y.S.2d 714, 378 N.E.2d at 81. The court reasoned that "even where a defense of entrapment is not made out because of the predisposition of the defendant to commit the crime, police misconduct may warrant dismissal on due process grounds." *Id.* 378 N.E.2d at 82–83, 406 N.Y.S.2d at 719.

What the court in *Isaacson* accomplished was to functionally and legally separate and distinguish between outrageous government conduct and entrapment. In addition to *Isaacson*, other federal and state courts recognize that while some factors appropriate to the entrapment defense might well be relevant in resolving a claim of outrageous government conduct, the two defenses are legally distinct.[15] *See, e.g., United States v. Jones*, 13 F.3d 100, 104–05 (4th Cir.1993) (distinguishing the defendant's contention of outrageous government conduct as a due process issue separate and distinct from the subjective entrapment standard); *United States v. Cantwell*, 806 F.2d 1463, 1469 (10th Cir.1986); *United States v. Brown*, 635 F.2d 1207, 1212 (6th Cir.1980); *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978); *Rivera v. State*, 846 P.2d 1, 3–5 (Wyo.1993) [16]; *Hillis v. State*, 103 Nev. 531, 746 P.2d 1092, 1093–94 (1987) (per curiam) (citing *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978) in recognizing that outrageous government conduct could serve to bar a conviction on due process grounds, although the facts in *Hillis* did not give rise to a constitutional violation).

■ The significance of the distinction between outrageous government conduct and entrapment is that the existence of a predisposition on the part of the accused to commit a crime, while possibly fatal to a claim of entrapment, does not serve to eradicate a due process claim based on outrageous government conduct.

Having now defined the distinction between outrageous government conduct and entrapment, we now look to our own state's entrapment jurisprudence to determine what, if any, corrections must be made to accom-

15. **15.** We are not unmindful of some of the criticism that has been directed at the outrageous government conduct doctrine. *See United States v. Tucker*, 28 F.3d 1420, 1424–26 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995) (stating that "there is no authority in [the Sixth] [C]ircuit which *holds* that the government's conduct ... can bar prosecution of an otherwise predisposed defendant under the Due Process Clause of the Fifth Amendment"); *United States v. Santana*, 6 F.3d 1, 3–4 (1st Cir.1993) (stating that the outrageous government conduct doctrine "is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts").

**16.** In *Rivera*, the Supreme Court of Wyoming noted that it first recognized the outrageous government doctrine in *Mondello v. State*, 843 P.2d 1152, 1160 (Wyo.1992) (holding that "the outra-

geous conduct defense[, while not previously recognized in Wyoming, now] exists ... but that it does not apply under the circumstances of Mondello's case"). The *Rivera* court, in refusing the defendant's request to supplement the subjective test of entrapment with the objective test of entrapment, explained that the outrageous government conduct doctrine:

> bears some similarity to the objective theory of entrapment, [but] should not be confused with either of the traditional approaches to the entrapment defense. It examines neither the defendant's predisposition to commit the crime nor the likely effect of police conduct on a hypothetical reasonable man. Instead, the defense focuses purely upon the conduct of the police.

*Rivera*, 846 P.2d at 4.

modate the entrapment defense standard with an outrageous government conduct analysis.

## B.

*West Virginia's Entrapment Jurisprudence*

West Virginia formally recognized entrapment as a defense to criminal prosecution using the subjective or "origin-of-intent" standard in *State v. Basham:* [17]

> Entrapment, as a defense to criminal prosecution, occurs where the design or inspiration for the offense originates with law enforcement officers who procure its commission by an accused who would not have otherwise perpetrated it except for the instigation or inducement by the law enforcement officers.

Syllabus Point 3, *State v. Basham,* 159 W.Va. 404, 223 S.E.2d 53 (1976).

Shortly after *Basham,* we added another dimension to the entrapment defense in *State v. Knight,* by reasoning that there was no logical justification why the adoption of the subjective test would prevent the application of the objective standard:

> A trial court may find, as a matter of law, that a defendant was entrapped, if the evidence establishes, to such an extent that the minds of reasonable men could not differ, that the officer or agent conceived the plan and procured or directed its execution in such an unconscionable way that he could only be said to have created a crime for the purpose of making an arrest and obtaining a conviction.

Syllabus Point 4, *State v. Knight,* 159 W.Va. 924, 230 S.E.2d 732 (1976).

Accordingly, after *Knight* the structure of the entrapment defense was determined by the facts of the case rather than a commitment to a singular test. By adopting this "two-tiered approach" which recognizes two independent standards for the defense of entrapment, we look to the facts of a particular case to determine whether or not the objective "police conduct" test would prohibit conviction of a defendant when the evidence overwhelmingly reveals unconscionable government conduct inducing the crime, regardless of the predisposition of the accused to commit the crime; or whether the facts were more shaped toward the subjective "origin-of-intent" test, by analyzing whether the conduct of the government incited or induced a person to commit an act that a person was not otherwise predisposed to commit for the purpose of obtaining evidence for the prosecution of that crime.

In *Basham* and *Knight,* we compartmentalized the defense of entrapment, with the subjective test being a question for jury resolution and the objective test being a question of law for the court to determine. This analysis had a short life. In *State v. Hinkle,* 169 W.Va. 271, 286 S.E.2d 699 (1982), we found a rededication to both the objective and subjective standards; however, we deviated from the formula announced in *Knight* by empowering the trial court to direct a verdict of acquittal in those cases where the defendant proves the government induced the commission of a crime and the State fails to offer any evidence of predisposition. The syllabus in *Hinkle* was:

> When a defendant presents evidence of police conduct amounting to entrapment, and the State fails to rebut that evidence or prove defendant's predisposition to commit the crime charged, a trial judge should direct a verdict for defendant as a matter of law.

Syllabus, *State v. Hinkle,* 169 W.Va. 271, 286 S.E.2d 699 (1982).

As we have recognized in the general survey of the law of entrapment, the singular flaw in our entrapment analysis is not recognizing that the unconscionable governmental conduct theory is separate and distinct from entrapment. We do so now, and in doing so, we specifically overrule *State v. Knight* and its progeny to the extent that *Knight* holds that a trial court can apply both the subjective and objective tests as part of an entrapment defense, and instead hold that the defense of entrapment is fully contained within the subjective test standard. Any inquiry into the outrageous or unconscionable con-

---

**17.** Two earlier opinions refer to entrapment as a defense by way of *obiter dicta* in *State v. Piscion-* *eri,* 68 W.Va. 76, 69 S.E. 375 (1910); *State v. Jarvis,* 105 W.Va. 499, 143 S.E. 235 (1928).

duct of the police, which was previously considered under our two-tiered analysis, is now considered under a separate constitutional due process analysis.

This will not be a radical departure from our existing body of law because we recognized a sense of governmental overreaching in *Knight* as part of the entrapment defense. The only thing we need to do now is to remove the unconscionable police conduct standard from the entrapment defense to a separate and distinct due process claim of outrageous government conduct. What remains of the entrapment defense is the subjective standard set forth in *Basham, Knight,* and *Hinkle.*[18] The practical effect of what we are doing is to adopt the reasoning recited in footnote 3 of *State v. Hinkle,* wherein we recognized that "there should be a separate and distinct defense, other than entrapment, for a criminal defendant subjected to police or government agent misconduct. If the government's abuses are great, fundamental fairness and due process should preclude prosecution, regardless of a defendant's predisposition." *State v. Hinkle,* 169 W.Va. 271, 272–73 n. 3, 286 S.E.2d 699, 700–01 n. 3 (1982); *see also State v. Leadingham,* 190 W.Va. 482, 491, 438 S.E.2d 825, 834 (1993) (quoting with approval note 3 of *State v. Hinkle* ).

■ Accordingly, the exclusive entrapment defense to criminal prosecution in West Virginia is the subjective standard, which occurs where the design or inspiration for the offense originates with law enforcement officers who procure its commission by an accused who would not have otherwise perpetrated it except for the instigation or inducement by the law enforcement officers. Syllabus Point 3, *State v. Basham,* 159 W.Va. 404, 223 S.E.2d 53 (1976). To the extent that *State v. Knight* and its progeny are inconsis-

tent with this position, they are expressly overruled.

■ The formula for proving the separate and distinct claim of outrageous government conduct shall be that the defendant must show that the conduct of the government in inciting the defendant to commit the crime was so egregious and reprehensible that it violates notions of "fundamental fairness, shocking to the universal sense of justice," as mandated by the due process clauses of the Fifth Amendment of the United States Constitution[19] and article three, section ten of the West Virginia Constitution.[20] *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973) (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268, 276 (1960)). *See also United States v. Pedraza,* 27 F.3d 1515, 1521 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 520, 130 L.Ed.2d 425 (1994); *United States v. Harris,* 997 F.2d 812, 816 (10th Cir.1993); *United States v. Spitz,* 678 F.2d 878, 881 (10th Cir.1982). If outrageous government conduct rising to a due process violation is proven, the State shall be barred from any prosecution relating to a crime resulting from that conduct.

Finally, after reallocating the entrapment defense to separate and distinct categories, there is still some unfinished business before we address the issues presented by the facts of this appeal.

In *State v. Hinkle,* we rejected an invitation to adopt a mechanical formula describing the burden of proving the defense of entrapment. We revive that invitation and now accept it. There is no good reason to continue resisting a burden-shifting paradigm in the application of the subjective standard of entrapment.

There are two recognized theories relating to the burden of proof of the defense of

---

**18.** *See also State v. Harshbarger,* 170 W.Va. 401, 294 S.E.2d 254 (1982), which was decided after *Knight* and *Hinkle,* and cited *Basham* with approval.

**19.** The Fifth Amendment of the United States Constitution provides, in pertinent part:

No person shall be . . . deprived of life, liberty, or property, without due process of law. . . .

U.S. Const. amend. V.

**20.** Article three, section ten of the West Virginia Constitution reads:

No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers.

W.Va. Const. art. III, § 10.

entrapment: the so-called bifurcated theory, where the question of entrapment is fractured into inducement and propensity, and the unitary theory, involving the single issue of entrapment. *See* Annotation, *Instructing on Burden of Proof as to Defense of Entrapment in Federal Criminal Case*, 28 A.L.R. Fed. 767, 771 (1976 & Supp.1995).

Under the bifurcated theory, the defendant has the burden of proving that the government induced the commission of a criminal act; once that proof is offered, then the burden shifts to the government to prove that the defendant was ready and willing to commit the crime without persuasion, that is, that the defendant had a propensity to commit the crime. Under the unitary theory of entrapment, the defendant has no burden of proof whatsoever, and the government has the burden of proving that the defendant was not entrapped. *See generally*, Annotation, *Instructing on Burden of Proof as to Defense of Entrapment in Federal Criminal Case*, 28 A.L.R. Fed. 767 (1976 & Supp.1995).

■ We find the more persuasive theory for proving the subjective standard of entrapment is the bifurcated approach whereby when the defendant invokes entrapment as a defense to the commission of a crime, the defendant has the burden of offering some competent evidence that the government induced the defendant into committing that crime. *See, e.g., United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2260, 132 L.Ed.2d 265 (1995) (stating that the "first step in a successful entrapment defense is to make a *prima facie* showing by presenting 'some evidence' " of inducement). Once the defendant has met this burden of offering some competent evidence of inducement, the burden of proof then shifts to the prosecution to prove beyond a reasonable doubt that the defendant was otherwise predisposed to commit the offense. *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); *United States v. Rodriguez*, 43 F.3d 117 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2260, 132 L.Ed.2d 265 (1995).

■ While the issue of the defendant's predisposition to commit the crime is usually reserved for the jury, *see United States v.*

*Jannotti,* 673 F.2d 578, 597 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also United States v. Johnson*, 872 F.2d 612, 621 (5th Cir.1989); *United States v. Nelson,* 847 F.2d 285, 287 (6th Cir.1988), a trial court may enter a judgment of acquittal if the State fails to rebut the defendant's evidence of inducement, or fails to prove the defendant's predisposition to commit the offense charged beyond a reasonable doubt. Syllabus, *State v. Hinkle,* 169 W.Va. 271, 286 S.E.2d 699 (1982).

### C.

### *Application of the Separate Standards to the Facts of this Case*

With the separation of the defense of entrapment from the outrageous government conduct doctrine as a backdrop, we now turn our discussion to an analysis of these principles measured against the facts of this case. As is our custom, we begin by defining and applying the appropriate standard of review.

### 1.

### *Preservation of Issues for Review*

The defendant contends that the trial court should have entered a judgment of acquittal on the strength of the entrapment defense, because after the defendant offered evidence of government inducement to deliver marijuana, the burden of proving predisposition to commit that crime shifted to the prosecution, which allegedly failed to introduce sufficient evidence demonstrating beyond a reasonable doubt that the defendant was predisposed to commit that crime.

The defendant's position is not stated as precisely as we have just framed his contention. At trial, the defendant's quarrel with the trial court's refusal to enter a judgment of acquittal was grounded more on the proof of government misconduct and not necessarily the failure of the State to prove predisposition beyond a reasonable doubt. The defendant has confused the objective and subjective standards under both *Knight* and *Hinkle,* which is yet another reason why we are removing the outrageous government

conduct standard from the entrapment defense.

However, we believe that the defendant has adequately preserved for review our consideration of whether, first, the trial court was correct in submitting the issue of entrapment for jury resolution under the subjective standard and, second, whether as a matter of law the trial court should have entered a judgment of acquittal barring the defendant's prosecution resulting from outrageous government conduct.

We will address the standards of review for both the entrapment defense and the outrageous government conduct doctrine.

### 2.

### Standard of Review: Entrapment Defense

■ Our analysis of the standard of review must begin with the recognition that the only issue preserved for appeal was the failure of the trial court to enter a judgment of acquittal. A motion for judgment of acquittal challenges the sufficiency of the evidence. Franklin D. Cleckley, 2 *Handbook on West Virginia Criminal Procedure* 292 (2d ed.1993).

■ What we have done today is retain a separate and distinct subjective test of entrapment and adopt a burden-shifting mechanism whereby after the defendant offers some competent evidence of inducement, the burden shifts to the State to prove the defendant's predisposition beyond a reasonable doubt. Because the State bears the burden of proving the defendant's predisposition to commit the offense, the defendant's challenge, in essence, strikes at the sufficiency of the State's evidence on the issue of predisposition. *See United States v. Byrd,* 31 F.3d 1329, 1335 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1432, 131 L.Ed.2d 313 (1995). Upon review, then, we will examine the evidence in the light most favorable to the prosecution, and will reverse only if no rational trier of fact could have found predisposition to exist beyond a reasonable doubt. *See* Syllabus Point 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995); *see also United States v. Jannotti,* 673 F.2d 578, 598 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).

### 3.

### Standard of Review: Outrageous Government Conduct

■ When a defendant appeals a trial court's refusal to find as a matter of law that the government acted outrageously in violation of the defendant's due process rights, we will review that decision de novo to the extent that if there is insufficient evidence of outrageous government conduct so as to violate notions of fundamental fairness, shocking to the universal sense of justice, the ruling of the trial court will not be reversed. *See United States v. Pedraza,* 27 F.3d 1515, 1521 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994). Any factual determinations made by the trial court in issuing its ruling on the claim of outrageous government conduct will be reviewed under a clearly erroneous standard.

Having established the appropriate standards of review for both the entrapment defense and for a claim of outrageous government conduct, we now turn to an analysis of the facts in this case as measured against our legal principles on entrapment and outrageous government conduct. We are able to apply the legal principles announced in this opinion to the facts of this case because, as we have stated, we have not radically departed from our existing law, but simply divorced any inquiry into unconscionable or outrageous police conduct with a constitutional dimension from our entrapment jurisprudence.

### D.

### Analysis

### 1.

### Entrapment

■ As part of its case-in-chief, the State introduced evidence of the recorded conversations preceding the delivery of marijuana from the defendant to the informant in exchange for thirty dollars. The deciding portion of that conversation was the defendant's

reason for not being able to immediately deliver the marijuana because he had just "sold the last one a little while ago." This excuse is sufficient evidence to allow a jury to consider whether or not the defendant was entrapped by the government to commit the offense. In other words, while it is true that the defendant did offer more than just "some competent evidence" that the government induced him to commit the crime, it is equally true that the State offered evidence beyond a reasonable doubt that the defendant was predisposed to commit the crime simply within the singular response that he had just "sold the last one a little while ago."

There is testimony by both the defendant and the informant that the defendant was reluctant to engage in this drug transaction. However, that reluctance does not overcome the evidence of the defendant's predisposition to the extent that the issue of entrapment was not a question for jury resolution. The defendant's hesitancy and reluctance was part of the factual matrix from which a jury was entitled to consider the issue of entrapment.

For example, the jury heard the following testimony of Bennington, which implicated the defendant in a drug milieu:

Q Okay, so you actually purchased marijuana off Chester Houston that day?

A Yes, sir.

Q And what—did you indicate—or was there any indication of future purchases, or how did you leave it?

A Well, wanted to know if we'd burn one and I told him I couldn't right then, cause I had to take it back to another guy, where—that helped me buy it, you know.

Q Do you know what he meant by "burning one"?

A Smoke one, I guess.

Q Okay, so he wanted to smoke marijuana with you right then. So after you— in what form was the marijuana that you received?

A It was in a sandwich bag.

Q Okay, in a plastic bag?

A Yeah.

■ There are inconsistencies in the testimony relating to the defendant's predisposition to deliver marijuana. However, the jury, as the finders of fact, have the responsibility of weighing the evidence and the credibility of the witnesses and resolving these inconsistencies within the framework of the instructions given to them by the court. *See State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Within this entire record, and viewing the evidence in the light most favorable to the prosecution, we believe a jury of reasonable persons could have found that the defendant was predisposed beyond a reasonable doubt to commit the offense for which he was convicted. The trial court acted properly when it refused to grant the motion for judgment of acquittal on the entrapment defense and allowed the jury to consider the question.

2.

*Outrageous Government Conduct*

■ We now apply the formula for determining outrageous government conduct that was previously described as conduct being so egregious and reprehensible that it violates notions of " 'fundamental fairness, shocking to the universal sense of justice,' [as] mandated by [due process]". *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973) (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268, 276 (1960)). In determining whether law enforcement officers engaged in outrageous conduct rising to the level of a due process violation, we consider the following factors: 1) whether the government's conduct went beyond that of mere inducement, such that the government must have "created" or "manufactured" the crime solely for the purpose of generating criminal charges and without any motive to prevent further crime or protect the public at large; 2) whether the government, in procuring the defendant's commission of the crime, engaged in criminal or improper conduct repugnant to our sense of justice; and 3) whether the government appealed to humanitarian instincts such as sympathy, past friendship, or temptation by exorbitant gain to overcome

the defendant's reluctance to commit the offense. *See United States v. Ramirez*, 710 F.2d 535, 539–40 (9th Cir.1983); *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 719–20, 378 N.E.2d 78, 83 (1978).

 In addressing the defendant's claim of outrageous government conduct, there is nothing in this record to justify the conclusion that the law enforcement officers, including the informant, engaged in outrageous conduct as a matter of law. There is nothing in the record that remotely suggests that the law enforcement agents of Upshur County manufactured a crime solely for the purpose of generating criminal charges without any desire to prevent further crime or protect the public at large; engaged in criminal or improper conduct repugnant to our sense of justice; or attempted to procure the commission of the offense by appealing to the defendant's humanitarian instincts through friendship, sympathy, or exorbitant gain to overcome the defendant's reluctance to commit the offense. Conversely, what the record does show is that Bennington asked the defendant to sell him some marijuana without employing any artifice, device, or coercion, and that this was a transaction made with the defendant as a willing participant in the delivery of marijuana. The evidence is woefully inadequate to support a finding as a matter of law that the law enforcement agents of Upshur County (including the informant Bennington) acted so outrageously as to violate notions of fundamental fairness, shocking to the universal sense of justice. We therefore find that the trial court acted properly in refusing to find outrageous conduct as a matter of law and allowing the case to proceed with the subjective test of entrapment being the only defense available to the defendant. Therefore, the trial court correctly denied the defendant's motion for judgment of acquittal.

### E.

### *Whether the Defendant's Sentence was Excessive*

The defendant also contends that his sentence was excessive under the circumstances,

in that the defendant had no prior criminal record, and that 120 days of incarceration would result in the loss of his job and income.

 At trial, the defendant was convicted of delivering a controlled substance in violation of W. Va.Code 60A–4–401(a) (1983). Because marijuana falls under Schedule I of the Uniform Controlled Substances Act, W. Va. Code 60A–2–204(d)(14) (1991), the trial court sentenced the defendant to a term of not less than one nor more than five years, in compliance with W. Va.Code 60A–4–401(a)(ii) (1983).[21]

The trial court granted the defendant's motion that the sentence be suspended and that he be placed on probation, contingent upon the defendant serving a period of 120 days incarceration in the Upshur County Jail.

W. Va.Code 62–12–9 (1994) sets forth the conditions of release for a defendant receiving probation. Specifically, subsection (b)(4) provides, in relevant part, that a defendant shall, "in the discretion of the court, be required to serve a period of confinement in the county jail of the county in which he was convicted for a period not to exceed one third of the minimum sentence established by law or one third of the least possible period of confinement in an indeterminate sentence, but in no case shall such period of confinement exceed six consecutive months." W. Va.Code 62–12–9(b)(4) (1994). The minimum sentence prescribed under W. Va.Code 60A–4–401(a)(ii) (1983) is one year. Thus, the trial court's decision to require the defendant to serve 120 days in the county jail as a condition of the suspension of the sentence and probation was within the statutory limits of W. Va.Code 62–12–9(b)(4) (1994).

 In *State v. Goodnight*, we held that "[s]entences imposed by the trial court, if within statutory limits and if not based on some unpermissible factor, are not subject to appellate review." Syllabus Point 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982). Because the trial court was well within its statutorily-prescribed discretion,

---

**21.** *See supra* note 6, for the text of W. Va.Code 60A–4–401(a)(ii) (1983).

**232**

and because the defendant failed to show that the sentence was based on some impermissible factor, the sentence imposed by the trial court is not subject to our review.

### III.

### CONCLUSION

In summary, we agree with the trial court to the extent that the issue of entrapment was properly submitted to the jury for resolution. We also agree that there was sufficient evidence to support the jury's verdict, that while the government may have induced the commission of the crime, there was proof beyond a reasonable doubt that the defendant was predisposed to commit that offense.

We do not agree that there was sufficient evidence for the trial court to grant a motion for judgment of acquittal on the issue of outrageous government conduct, nor do we agree that the sentence imposed upon the defendant was not within acceptable statutory limits. Accordingly, the defendant's conviction is affirmed.

Affirmed.

CLECKLEY, J., concurs, and reserves the right to file a concurring opinion.

CLECKLEY, Justice, concurring:

I agree entirely with the scholarly opinion of Justice Recht. I concur only to reemphasize several significant aspects of the entrapment doctrine.

In today's major opinion, this Court eloquently adds judicial gloss to the legal test for establishing entrapment. A valid entrapment defense requires proof of two related elements: (1) that the State induce the offense, and (2) that the defendant not be predisposed to commit it. *See Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); *Mathews v. United*

*States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54, 61 (1988); *State v. Jarvis*, 105 W.Va. 499, 143 S.E. 235 (1928). Before the defendant may raise an entrapment defense, he or she must offer "sufficient" evidence of both state inducement and his or her own lack of predisposition. In the past, the bare terms—inducement and predisposition—have done little to disclose the encrusting precedent. Today's opinion by Justice Recht easily becomes the most useful West Virginia discussion on the subject. This decision, which is post–*Jacobson*, not only illuminates the entrapment concept, but it rids entrapment jurisprudence of the burdensome and confusing "due process" theory.

Appropriately, the majority opinion makes clear that despite some general strictures against the State's "manufacturing" of crimes, inducement requires something more than a State agent or information suggesting the crime and providing the occasion for it. Rather, inducement consists of providing an opportunity *plus* something else—typically, excessive pressure by the police or their informant or the police taking advantage of the defendant in an improper way.[1] There is no better means of getting a sense of what courts have regarded an "improper" inducement than the list of cases and parentheticals set forth in the majority opinion. *See also* the opinion of Chief Judge (now Justice) Breyer in *United States v. Gendron*, 18 F.3d 955 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 654, 130 L.Ed.2d 558 (1994).

Although the entrapment doctrine is primarily concerned with curbing such improper pressure by the agents of the State, a competing policy has led to the second requirement, namely, that the defendant also not be predisposed to commit the crime. Of course, until some evidence of inducement has been shown, a showing of predisposition is unnecessary.[2] On the other hand, if the defendant

---

**1.** Examples are: Improper appeals to sympathy, *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); promises of extravagant rewards; or the kind of relentless and extreme trickery engaged in by the postal and custom agents in *Jacobson*, 503 U.S. at 543–47, 112 S.Ct. at 1537–40, 118 L.Ed.2d at 180–83; intimidation, threats, dogged insistence and arm twisting based on need, sympathy, friendship, or

the like. *See, e.g., Sorrells v. United States*, 287 U.S. 435, 440, 53 S.Ct. 210, 212, 77 L.Ed. 413, 416 (1932) (using sentiment of "one former war buddy ... for another" to get liquor during prohibition).

**2.** The inquiry for the jury on this issue should first be to determine if there is any evidence that an agent for the state took the first step that led

is found to be predisposed to commit the crime, the entrapment defense is unavailable regardless of the inducement. The premise supporting predisposition as an element of entrapment is that a defendant predisposed to commit the crime should not get off merely because the agents of the State gave the defendant too forceful a shove along the path that the defendant would readily have taken anyway.[3] A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so. Predisposition may be shown by evidence of (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the defendant to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the indictment. In essence, the term predisposition focuses on the defendant's state of mind *before* state agents suggest that he commits the crime. The question the trier of fact must answer is whether the defendant would have been likely to commit the same crime *without* the undue pressure actually asserted.

The majority decision also properly, and for the first time in West Virginia, labels entrapment as a burden shifting defense, *i.e.*, once the defendant has made a threshold showing, the burden shifts to the State to prove beyond a reasonable doubt *either* that there was no undue State pressure or trickery or that the defendant was predisposed. By making entrapment a burden-shifting defense, it becomes the trial court's duty to instruct the jury as to the state's burden.[4] Thus, the problem for the jury is primarily that of applying a general standard—actually two such standards—inducement and predisposition to varying patterns of facts.

To be sure, in the ordinary case, entrapment presents a question for the factfinder. Even where there are no credibility issues or tensions in the evidence, entrapment is treated as a jury question. That does not mean complete freedom for the jury, *see Jacobson, supra,* and *State v. Hinkle,* 169 W.Va. 271, 286 S.E.2d 699 (1982); it does mean that where a rational jury could decide either way, its verdict will not be disturbed. In most cases, reversible error is committed by the trial court only where it fails to submit

---

to a criminal act. If the jury finds that there was no such evidence, there can be no entrapment and the jury's inquiry on its defense should end.

3. It is quite true that under *Jacobson* predisposition does count if it is itself the product of improper police conduct. This point could have reasonably been said in *Jacobson.* There, the government through its own mailing to the defendant, purporting to come from others, encouraged the defendant to believe that procuring child pornography was a blow against censorship and in favor of the First Amendment. If there was predisposition, said the Court, the government instilled it. 503 U.S. at 552–53, 112 S.Ct. at 1542–43, 118 L.Ed.2d at 186–87.

4. The Supreme Court stated in *Jacobson,* that where the defendant relies upon the defense of entrapment, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." 503 U.S. at 549, 112 S.Ct. at 1540, 118 L.Ed.2d at 184. Although this instruction is incomplete, I propose a simple instruction such as the following:

The defendant is relying upon the defense of entrapment. A person is entrapped when the

person has no previous intention to violate the law and is persuaded to commit a crime by state agents. On the other hand, where a person is predisposed to commit the offense when first contacted by state agents, the fact that the state afforded him the opportunity to do so does not constitute entrapment. Once the defense of entrapment is raised, the burden is on the state to prove beyond a reasonable doubt that the defendant was not entrapped.

There are two elements to the defense of entrapment: (1) an inducement by the state to commit the crime, and (2) the absence of predisposition on the part of the defendant.

The second part of the defense of entrapment concerns predisposition of the defendant at the time when he is first approached by state agents. Predisposition is a state of mind which readily responded to the opportunity furnished by the officer or his agent to commit the offense charged.

If the evidence in this case leaves you with a reasonable doubt whether the defendant had any intent to commit the crime except for the inducement or persuasion on the part of some state officer or agent, then it is your duty to find the defendant not guilty.

**234**

the entrapment issue to the jury.[5] Ordinarily, the evidence will not be so overwhelming as to establish improper conduct by the State as a matter of law. *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).[6] In this case, the police efforts, although far from pristine, were dubious rather than flagrant, or at least a factfinder could so determine. I make this point merely to suggest that to assume that we are dealing with a sharp boundary rather than a spectrum is an illusion.

Allocating to the jury broad discretion in entrapment cases is not new to West Virginia jurisprudence. By tradition, issues associated with guilt or innocence (duress, insanity, entrapment, self-defense) are submitted to the jury. *See United States v. Gaudin,* — U.S. ——, ——, 115 S.Ct. 2310, 2313–14, 132 L.Ed.2d 444, 449–50 (1995) (elements of a crime); *State v. Koon,* 190 W.Va. 632, 640, 440 S.E.2d 442, 450 (1993) (*per curiam*) (mental duress); *State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981) (insanity); *State v. Kirtley,* 162 W.Va. 249, 252 S.E.2d 374 (1978) (self-defense). Other issues, perhaps similar in kind but related to collateral matters, are determined, at least initially, by the court (*e.g.,* the reasonableness of a search and seizure and, in many jurisdictions, the voluntariness of a confession. *Cf State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978)). In the former category of merit-released issues, the jury in close cases effectively decides not only what happened but also whether what happened deserves the legal label described in the jury instructions.[7]

Nevertheless, the "gatekeeper" role of the trial judge should not be undetermined. First, except where a jury acquits in a criminal case, judges remain as a check on juries in the extreme case—one where the judge thinks that a rational jury could reach only one result. Second, the trial court plays a critical role in limiting the kind of evidence that is to be submitted to prove predisposition.[8] The trial court is empowered to make appropriate use of Rule 404(b) of the West Virginia Rules of Evidence and especially the balancing under Rule 403. *See State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994). Third, the trial court must approve and deliver only meaningful instructions for the jury.

---

5. If the accused suggests that entrapment belongs in the case, it seems not unfair to expect the defendant to point to a modicum of evidence supportive of his or her suggestion. The alternative—that the prosecution be forced to disprove entrapment in every case—seems plainly unacceptable. I believe the rule should be that the defendant is entitled to a jury instruction on entrapment if there is record evidence which fairly supports the claims of both state inducement of the crime and the defendant's lack of predisposition. To meet this burden, the record must show sufficient evidence which if believed by a rational juror, would suffice to create a reasonable doubt as to whether the state actors induced the defendant to perform a criminal act that he was not predisposed to commit. The existence or nonexistence of the required quantity of evidence in a given case is a matter of law for the court, and thus our review is plenary, reading the record evidence in the light most favorable to the defense.

6. We must affirm a jury's denial of an entrapment defense unless we determine, viewing the evidence in the light most favorable to the state, that no reasonable juror could have concluded beyond a reasonable doubt that an induced defendant was predisposed to commit the crime. *See State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

7. Giving the jury this broad discretion is not only a good idea, it is the best idea for resolving entrapment issues. In large part, predisposition turns on making a judgment as to how a defendant of a given character, background, and behavior would have acted in somewhat different circumstances. It is here that the common sense of the jury works at its best. At least as a composite, the jury, more than the judge, knows more about how human beings behave outside court.

8. The trial court may allow the jury to consider evidence in connection with the defendant's motive and predisposition to commit the crime for which he is charged under Rule 404(b). I emphasize Rule 404(b) because in my judgment proper application of this rule contains the necessary safeguards to protect against undue prejudice. *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). Of course, courts may admit extrinsic prior bad acts evidence for these purposes, subject to Rule 403's requirement that the danger of unfair prejudice not substantially outweigh its probative value. We will reverse a circuit court's decision to admit evidence under Rule 403 only for an abuse of discretion.

Finally, one further word is in order. What may be even more troublesome in cases of this kind is the possibility of undue encouragement to the informant, as a result of compelling State inducements (dismissal or reduction of charges or money) to overstep the bounds in the field, or in the courtroom, or both. In his or her dual role as both instigator and witness, an informant has a special capacity—as well as a strong incentive—to tilt both the event itself and his or her testimony about it. If the State is going to use its informant in a role just short of a provocateur, it would be well advised to consider devising restrictions that will at least lessen the likelihood for abuse. Otherwise, the lesson of history in West Virginia is that this Court itself will take precautions and our adjustments are usually more rigid and far-reaching. *See Matter of W. Va. State Police Crime Lab,* 190 W.Va. 321, 325, 438 S.E.2d 501, 505 (1993) (*Zain* cases: "[t]he law forbids the State from obtaining a conviction based on false evidence").